TOWN OF MANCHESTER *vs.* THE ROGERS PAPER MANUFACTURING COMPANY ET ALS.

MALTBIE, C. J., HINMAN, BANKS, AVERY and BROWN, Js.

Argued June 3d—decided July 10th, 1936.

*John T. Robinson* and *William W. Fisher,* for the appellant (defendant Cheney Brothers).

*William S. Hyde,* for the appellant (plaintiff).

*Charles Welles Gross,* with whom was *Willis G. Parsons,* for appellee (named defendant).

MALTBIE, C. J. The plaintiff brought this action against the Rogers Paper Manufacturing Company and Cheney Brothers, both corporations, to recover certain charges for the use of its sewer system. The defendant Rogers Company owned and since 1901 has owned a mill upon Hop Brook in the plaintiff town. From some time before 1889 until 1901 this mill was owned by Henry E. Rogers, who also owned another further down the stream. There was no water power at the upper mill, but at his lower mill the stream was utilized to furnish a part of the power to operate it. Between the two, Cheney Brothers owned a mill and all three mills took water from the stream for use in them which was returned in the form of waste water and sewage. In 1889 several members of the Cheney family petitioned the General Assembly for a charter for a private corporation to be known as the South Manchester Sanitary and Sewer District. While this petition was pending they entered into a contract with Rogers; this recited that the powers sought by the corporation might be detrimental to him; and in consideration of his agreement not to oppose the grant of the charter, the Cheneys agreed to save him harmless from any claim or assessment for the cost of the construc-

tion of the sewer and that they would compensate him for any damages sustained by reason of the diversion of any sewage used by him or for any damages to his water power or property by reason of such diversion, the compensation to be determined, if the parties could not agree, by three distinterested persons. The charter was granted and the District given power to construct sewers and assess the cost of so doing upon owners of property specially benefited. In the same year the persons who petitioned for the charter for the Sewer District secured a charter for a private corporation known as the South Manchester Water Company, and it was given power to condemn certain waters, including those of Hop Brook. All the stock of both corporations was, and until the sale of the property to the plaintiff continued to be, owned by Cheney Brothers, except certain directors' qualifying shares.

In 1892 proceedings were brought by the Water Company to condemn the waters of certain brooks and ponds tributary to Hop Brook above a certain point and a committee was appointed to award damages. The report of that committee states that Rogers contended before it that the effect of the taking of the waters would be ruinous to his business at the upper mill, but on this the committee ruled against him; that in connection with the operation of that mill he claimed to have a right to discharge into the stream large quantities of water which had become impure and deleterious by reason of its use in his manufacturing business, but the committee ruled that the proceedings would not affect any such rights he might have; and that the Water Company introduced evidence as to certain proposals of the Sewer Company with regard to the building of a sewer into which he could discharge the water from the mill. Against the acceptance of the report of the committee Rogers re-

monstrated and no further action was taken in the matter until 1898.

In that year he made an agreement with the Water Company in which, in consideration of a substantial sum of money, he agreed that the report might be accepted, and released all claims and demands he had against the Water Company, the Sewer District, Cheney Brothers, or the individuals who had secured the charters of the two corporations first named; he agreed that Cheney Brothers and the two corporations should forever have the right to discharge or otherwise dispose of all sewage, waste and impure water which he had or might have the right to have discharged into the stream or a pond into which it ran above his lower mill, without let, hindrance or claim for damages on his part; the Water Company agreed that he should have the right to discharge the waters of his upper mill as he had been accustomed to do into the stream until such time as the Sewer District or the Water Company should build or furnish or cause to be built or furnished a sufficient sewer to receive them; and Rogers further covenanted for himself, his heirs and assigns, to discharge all such water into the sewer "when the same shall be built and furnished, without expense to the said Rogers, and will so continue to discharge the same into said sewer." Immediately after this agreement was made the sewer was constructed and it took the waste water and sewage from the mill. This was without cost to Rogers. The Sewer District never made any assessment of benefits for the construction of the sewer against anyone, Cheney Brothers furnishing the funds for that work. The District made no service charge to users of the sewer until 1929, but after the completion of a purification plant in that year it did make such a charge against those using the sewer aside from the Rogers Company.

In 1932 negotiations were entered into between the plaintiff, Cheney Brothers, the Water Company and the Sewer District for the purchase by the town of the property and rights of the Sewer District and Water Company. The original proposal was submitted by Cheney Brothers to the selectmen of the town and it contained a provision that: "As a partial offset to the transfer of the trunk line sewers, without charge to the town, the town is to assume the obligation of the Sewer Company, the Water Company and Cheney Brothers to take away all waste water from Rogers Paper Mills without expense to the owners." While the negotiations were in progress the president of the Sewer District and Water Company conferred with the president of the Rogers Company concerning the contract of 1898, to see if the matter might be settled before the properties were sold, as the selectmen were holding up the transaction because of the obligations arising out of the contract. In a letter to the selectmen dated June 27th, 1933, Cheney Brothers restated their proposal for the sale of the property and this contained a provision that Cheney Brothers would "continue to assume the existing obligation" of the Water Company and Sewer District to take away waste water from the Rogers mills without expense to the plaintiff.

As this letter was signed only by Cheney Brothers, another, dated June 29th, 1933, was sent to the selectmen, signed not only by Cheney Brothers but also by the Sewer District and the Water Company. It contained these provisions: "4. Cheney Brothers will assume any obligation of the South Manchester Water Company to Henry E. Rogers, or his assigns, existing by virtue of a contract between the South Manchester Water Company and said Rogers, dated June 13th, 1898, and recorded in Manchester Land Records, Vol. 45, page 511. 5. The town will assume the expense

of the operation and maintenance of the purification plant and will charge a proportion of such cost against Cheney Brothers estimated quarterly on the basis of the ratio of the volume of sewage delivered to the purificaton plant by Cheney Brothers' Mills, plus the volume of sewage delivered to the purification plant in accordance with the contract referred to in Paragraph 4, to the total volume of sewage from the whole system delivered to such purification plant." The provisions we have quoted were inserted at the instance of the plaintiff, which had insisted that some agreement be made with reference to the rights of the Rogers Company under the contract of 1898.

The board of selectmen voted to recommend the purchase and upon application of the Water Company and Sewer District for approval of the sale the public utilities commission held a hearing. At that hearing the president of Cheney Brothers testified; he stated that the effect of the agreement between Rogers and the Water Company was involved in the transaction; that at first it was thought that the plaintiff should assume the obligation of the contract, but that the agreement in the offer to it that Cheney Brothers would assume that obligation removed the matter from the transaction; and considerable discussion followed as to the rights of the Rogers Company under the agreement. The commission approved the proposed sale, and subsequently the purchase of the properties upon the terms contained in the letter of June 29th, 1933, was approved by the electors of the town in accordance with an act of the Legislature authorizing it to make the purchase. Thereafter the town by its selectmen and Cheney Brothers entered into a formal agreement substantially following the language quoted above from the letter of June 29th, 1933.

On April 11th, 1934, the town by its board of select-

men passed a vote fixing as of September 1st, 1933, the method of making service charges for the use of the sewer system and specifically fixing a basis of the charges for the use made of it by Cheney Brothers and the Rogers Company. This vote contained a provision as follows: "That, in the event the Town of Manchester is unable to collect from the Rogers Paper Manufacturing Company the aforementioned service charges made against it for its mill sewage and waste water, bills for said charges shall also be rendered to Cheney Brothers, Cheney Brothers having guaranteed the collectibility of the same." In accordance with this vote bills for the charges made against the Rogers Company were sent to it and at the same time to Cheney Brothers. Cheney Brothers filed a cross-complaint asking a declaratory judgment as to its obligations under the facts we have stated. The trial court found the issues for the Rogers Company, but held that there was a primary obligation upon Cheney Brothers to pay the charges made for the use of the sewer sytsem by the Rogers Company and that Cheney Brothers had no right to collect the amount so paid from the Rogers Company, and it gave judgment for the plaintiff to recover the charges from Cheney Brothers. The plaintiff and Cheney Brothers have both appealed, making the same claims, in substance, that the Rogers Company was liable to the plaintiff for the charges and that Cheney Brothers was not.

The Rogers Company claims that the agreement of 1898 between Rogers and the Water Company gave to him and it as his successor perpetual exemption from charges for the use of the sewer in connection with the mill. This contention requires that we search out the intent of the parties as evidenced in the contract. In doing this we do not regard the fact that the Sewer District was not a party to that agreement. It

is obvious that there was a substantial identity of interests throughout the transactions we have rehearsed between Cheney Brothers, the Sewer District and the Water Company and all were operated in close conjunction. The intent of the agreement can best be found in the situation underlying its making. In the contract of 1889 between Rogers and those who were seeking the charter for the Sewer District, the two matters that concerned Rogers were protection against being compelled to pay any part of the cost of the construction of the sewer and compensation for the diversion of water which otherwise would be returned to the stream, presumably because such diversion might affect the water power at his lower mill. See *Fisk* v. *Hartford,* 69 Conn. 375, 37 Atl. 983, decided in 1897. Rogers' contentions in the condemnation proceedings show that he was seeking compensation for the effect upon his manufacturing operations of the taking of the water above his mill and for the loss of the right to discharge waste water and sewage into the stream. The agreement of 1898 was clearly intended to dispose of these claims. Compensation for the effect upon his mills of the taking of the water was of course included; but, to remove any question as to the right of the other parties concerned to divert waste water and sewage, a matter which the committee had ruled was not involved in the condemnation proceedings, this right was specifically granted them by Rogers; and undoubtedly the money paid him included compensation for his surrender of any right he might have to require that waste water from the mills be returned to the stream. Rogers was surrendering rights of a continuing nature. If the condemnation proceedings, as he claimed, included them, the compensation award would be a lump sum presently paid him for that surrender, though the effect would continue

through the subsequent years. The same result must be attributed to his voluntary acceptance of an agreed sum in return for his withholding his opposition to the proceedings. It was a natural incident to the transaction that, in addition to the money paid him, he should also be granted immunity from any assessment for the cost of the construction of the sewer to carry off the waste water and sewage.

The claim of the Rogers Company as to the meaning of the provision in the contract that Rogers would discharge all waste water and sewage into the sewer "when the same shall be built and furnished, without expense to said Rogers, and will so continue to discharge the same into said sewer" goes much beyond that. In effect, it adds to the single sum paid to him a recurring compensation measured by the remission from time to time of any service charges which otherwise he would have to pay. That this was not within the intent of the parties in making the agreement accords with the nature of the issues intended to be settled by it.

Moreover, while the charter of the Sewer District provided for an assessment of special benefits for the purpose of paying the cost of the construction of the sewer, it contained no express authority to impose any service charge; Special Laws, 1889, p. 1213; such power was expressly given by an amendment to the charter granted in 1927; 20 Special Laws, p. 131; and until after that amendment no service charges were in fact made against any person. In the transactions previous to the making of the agreement there is no suggestion that such charges were at all contemplated. The inference that such a possibility was not at all in the minds of the parties when the agreement was made is inescapable. If, with the underlying situation in mind, we turn to the provision of the contract, the

most natural interpretation to be given to it is that the words "without expense to the said Rogers" had reference to the building and furnishing of the sewer at the time, not to the use of it thereafter. Indeed, had the other meaning been intended, the clause "without expense to the said Rogers" would not naturally have followed immediately upon the words "built and furnished" but would have been related also to the succeeding clause in which Rogers agreed to continue to discharge water from the mill into the sewer. At most, since no purification and sewer charge therefor were contemplated at the time, it could only have referred, in addition to the building and furnishing of the sewer, to the diversion and discharge of sewage into it.

In view of the fact that until 1929 no service charges were made against anyone, that they were not made against Rogers or the Rogers Company has no significance. It is true that from that time until the sale of the properties to the town in 1933, the District, while charging others, made no charge against the Rogers Company; but thirty years had elapsed, the meaning of the contract was not clear, and it is apparent that there was doubt in the minds of the representatives of the Sewer District and Cheney Brothers as to its real effect; the Rogers Company apparently was not consulted and had no part in securing exemption from the charges; and we do not consider the fact that no charges were made in the four years after 1929 as a controlling practical construction of the agreement. *Rockwell* v. *New Departure Mfg. Co.*, 102 Conn. 255, 306, 128 Atl. 302. Nor do we attach importance to the language in the letter of Cheney Brothers to the selectmen in which reference is made to "the existing obligation" of the Water Company and Sewer District to take away the waste waters of the Rogers' Mill, or

to statements of a similar import by the president of Cheney Brothers and its attorney at the hearing before the public utilities commission. These, at most, evidence the opinion then held by Cheney Brothers as to the meaning of the contract, equivocal in its language, and made under circumstances thirty-five years past. Indeed, the whole situation unmistakably discloses the uncertainty in the minds of the interested parties as to its actual effect.

Our conclusion is that the agreement of 1898 did not give Rogers or the Rogers Company any exemption from the payment of charges which might thereafter be made for the purification of sewage. The Company was not a party to the transaction resulting in the sale of the properties of the Sewer District and the Water Company to the town; indeed, it refused to make any agreement about the matter when this was proposed to it in order to facilitate that sale. The trial court has not found that the provisions in the agreement of sale concerning the matter were made for the benefit of the Rogers Company and in fact the Company disavowed any such interpretation of it. Nothing in that transaction could be held to have released the obligation of the Rogers Company to pay service charges.

Had the terms of the sale to the town merely included an assumption by Cheney Brothers of any obligation of the Water Company to the Rogers Company growing out of the contract of 1898, it could be contended with reason that, as the Water Company was under no duty to furnish or cause to be furnished sewer service to the Rogers Company free of charge, there was no such liability to be assumed and no basis for holding Cheney Brothers answerable for service charges based upon the use of the sewer made by the Rogers Company. But the terms accepted by the town went much further than that. They provided that the

town should charge Cheney Brothers a proportion of the cost of operating the purification plant upon the basis of the ratio of the volume of sewage delivered to the plant "by Cheney Brothers' Mills, plus the volume of sewage delivered to the purification plant in accordance with the contract" of 1898 between Rogers and the Water Company, to the total volume of the sewage delivered to the plant. This was the proposal submitted to the town and accepted by it. The inclusion of a provision for the payment on account of the sewage from the plant of the Rogers Company was an integral element in the contract and, as is apparent from the negotiations leading up to the sale, in the judgment of the town an important consideration in the acceptance of the proposal. That proposal made no provision for a separate payment for the sewage from the Rogers Company plant but that from its mills and those of Cheney Brothers were treated as a unit for the purpose of determining the amount to be paid by Cheney Brothers. The provision did not constitute a guaranty by Cheney Brothers of the payment by the Rogers Company of any charges to be made against it, but a direct promise by Cheney Brothers to make payments based upon the volume of sewage not only from its own mills but also upon that received from the Rogers Company mills. Unless the meaning of this provision is to be distorted from the fair import of the language used, the town has the right to receive payment from Cheney Brothers of a charge based upon the ratio which the volume of sewage from the mills of the Rogers Company as well as from its own bears to the entire volume of sewage delivered to the purification plant, without any necessity that the town should first seek payment from the Rogers Company.

There is, then, a several liability to the plaintiff on the part of Cheney Brothers and the Rogers Company

to pay the charges based on the sewage from the latter's mills and the plaintiff could recover from either without regard to the liability of the other. *Atwater* v. *Tupper,* 45 Conn. 144; *Donnarumma* v. *Korkin,* 97 Conn. 223, 116 Atl. 178; *Caviote* v. *Shea,* 116 Conn. 569, 575, 165 Atl. 788. The town could join both in a single action and have judgment against both, without affecting their several liabilities; *Gruber* v. *Friedman,* 104 Conn. 107, 111, 132 Atl. 395; or it could have sued either separately. After having joined both defendants in a single action, it could no doubt have withdrawn its claim to recover against either and had judgment only against the other. It did not do that but appealed from the judgment, upon the same ground taken by Cheney Brothers, that the Rogers Company is liable for the charges but Cheney Brothers is not. The trial court was in error in holding that the Rogers Company was not liable to judgment, but was correct in holding that Cheney Brothers was liable. The necessary result is that the case must be remanded that judgment may be entered for the plaintiff to recover from both defendants. It will then be the right of the plaintiff to take out execution against either as it chooses. *Sheldon* v. *Kibbe,* 3 Conn. 214; *Morgan* v. *Chester,* 4 Conn. 387; *Chapin* v. *Babcock,* 67 Conn. 255, 34 Atl. 1039.

Cheney Brothers claimed in its cross-complaint that the court declare that it would have a right to be reimbursed by the Rogers Company for any sum it might have to pay on account of sewage from the latter's mill and the trial court adjudged that it would have no such right. This conclusion is assigned as error but the matter has not been argued before us by the appellants. The issue might well be of present practical consequence to the parties under the judgment of the trial court, but under that which will fol-

low our direction the question whether Cheney Brothers will ever be called upon to make the payment for the sewage from the Rogers Company mills is, to say the least, doubtful. Under these circumstances there is no sufficient reason for a declaration of rights as to it and in the final judgment that issue should not be adjudicated. *Sigal* v. *Wise,* 114 Conn. 297, 302, 158 Atl. 891.

The only ruling on evidence pressed by the appellants, the admission in evidence of a portion of the stenographer's notes taken at the hearing before the public utilities commission upon the application for approval of the sale, which was concerned with the effect of the contract of 1898, and was claimed as showing admissions by the president of Cheney Brothers, is immaterial in the view we take of the case.

There is error, the judgment is set aside and the case remanded with direction to enter judgment upon the complaint for the plaintiff to recover damages against both defendants, and upon the cross-complaint, declaring the rights of the parties in accordance with this opinion.

In this opinion the other judges concurred.